UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TERRANCE MORRIS,<br>*Plaintiff*, | )<br>)<br>) | |
| *vs.* | )<br>) | 1:09-cv-01168-JMS-DML |
| TEMPLE ISLAND<br>*Defendant.* | )<br>)<br>)<br>) | |

## **ORDER**

Plaintiff Terrance Morris has brought this race discrimination action, [dkt. 1], against Defendant Temple Inland ("<u>TIN</u>"), his former employer of 14 months. He seeks back wages and back benefits for discrimination and financial distress based on his claim that IBT treated Mr. Morris' similarly situated white employees more favorably than him in the course of terminating all three of them for their poor job performances. [Dkt. 1 at 2.] Presently before the Court is TIN's Motion for Summary Judgment. [Dkt. 30.]

### I.

#### BACKGROUND

TIN is a manufacturing company that makes containerboard. [Dkt. 31 at 1.] Mr. Morris began working at TIN's Crawfordsville plant on January 22, 2007. [Dkt. 32-1 at 1.] He was one of three supervisors on the corrugators' "D Shift," overseeing the work of approximately seven crew members on rotating 12-hour shifts. [Dkt, 32-1 at 2-3.]

As a production manufacturing facility, the Crawfordsville plant is driven by the quality and quantity of the containerboard it produces. [Dkt. 32-3 at 3.] All plant supervisors are expected to run their respective shifts safely, efficiently, and productively. [Dkt 32-1 at 6-7.] When they do not, in accordance with the company policy, they are counseled and asked to im-

prove with guidance provided on the areas of needed improvement. [*Id.* at 2.] If performance remains at unacceptable levels, the supervisor is warned, put on probation, suspended, or terminated. [*Id.*]

During his 14-month employment with TIN, Mr. Morris' shift's performance consistently fell short of TIN's expectations. [Dkt. 32-2.] According to Mr. Morris, his low production numbers were because his shift ran comparatively heavier paper and his machines required more maintenance. [Dkt. 32-1 at 42-43.]

Mr. Morris has testified that, "from the beginning" of his employment, he was met with resistance from Production Supervisor Gary Riker, who "made derogatory remarks" about him until March 2007. [Dkt. 34 at 1.] In March, Mr. Morris met with General Foreman Brad Nomady and Production Manager Gary Huxhold to discuss this resistance, after which "nothing happened." [*Id.*]

On March 1, 2007, Morris was counseled for yelling obscenities and belittling his employees. [Dkt. 32-1 at 11-13.] Also in March, 2007, Mr. Morris was disciplined for low production numbers. [*Id.* at 16.] On both of these occasions, the company could have fired Mr. Morris but chose not to. [Dkt. 32-1 at 28, 39-40.]

According to Mr. Morris, however, in late March, the D Shift "broke [TIN]'s production in linear and square footage," whereupon TIN posted a congratulatory sign for the D Shift members. [Dkt. 34 at 2.] The congratulatory sign excluded Mr. Morris, despite his work for the D shift. [*Id.*]

In February 2008, Mr. Huxhold met with Mr. Morris for his first and only annual performance review. [*Id.* at 3.] Mr. Morris' review contained several number "1" ratings, indicating performance below expectations in "key management competencies" such as communication

skills, achievement/result focus, leadership, people management and planning and organizing. [Dkt. 32-3 at 67-70.]

Mr. Morris does not dispute the accuracy of his review, [*id.* at 26], and likewise admits that his review was similar to those received by the other D Shift supervisors, Brad Nomady and Mike Page. [*Id.* at 22-26.] Following his performance review, Mr. Morris' performance, specifically his production numbers, remained below TIN's expectations. [Dkt. 30 at 5.]

On March 14, 2008, Mr. Huxhold and Plant Manager Jon Zimmer met with Mr. Morris again to discuss D Shift's low production numbers. [Dkt. 32-1 at 33.] By that time, the D Shift was the lowest performing shift at the plant. [Dkt. 32-3 at 3.] Mr. Morris could have been terminated for his consistently low production numbers at that point. [Dkt. 32-1 at 45-46.]

On March 14, 2008, Mr. Morris received a written Performance Improvement Plan, which included a directive to obtain counseling on the areas of his performance that needed improvement. [Dkt. 32-1 at 32-34.] It further contained a warning that if Morris failed to improve, he would be terminated. [*Id.* at 38-39.] Mr. Morris refused to sign his Performance Improvement Plan, which was itself grounds for his termination. [Dkt. 31 at 6; dkt. 34 at 2.]

Because the D Shift's performance did not improve, Mr. Zimmer fired Mr. Morris on April 4, 2008. [*Id.* at 38, 40-41.]

All three D shift supervisors were ultimately terminated because of the shift's poor performance. [Dkt. 32-3 at 3.] D shift's lead supervisor, Mr. Nomady, a white male, was terminated for the D Shift's low production numbers two months before Morris. [Dkt. 32-1 at 43-44.] The other shift supervisor, Mr. Page, a white male who had been employed by TIN for more than 25 years, was terminated for the same reason fewer than three months after Mr. Morris. [Dkt. 32-3 at 3.]

Throughout his employment, Mr. Morris heard about discriminatory remarks made by hourly employees and various members of the management. [Dkt. 43 at 2.] On two occasions, he heard racist remarks by two regional managers. In a meeting, "hourly employees as well as management staff" said that a piece of equipment could be "nigger rigged," [*Id.*] On another occasion, another supervisor told Mr. Morris that Steve Follen, another plant employee, made the derogatory statement, "once we get rid of the brothers we will be alright." [*Id.* at 3.]

In September, 2009, Mr. Morris filed a complaint with the Indiana Civil Rights Commission. [Dkt. 1-1.] On June 27, 2009, the Commission provided Mr. Morris with a Right to Sue Notice. [*Id.*] Thereafter, Mr. Morris timely filed his suit in this Court.

## II.

### STANDARD OF REVIEW ON A MOTION FOR SUMMARY JUDGMENT

A motion for summary judgment asks that the Court find that a trial based on the uncontroverted and admissible evidence would—as a matter of law—conclude in the moving party's favor and is thus unnecessary. *See* Fed. R. Civ. Pro. 56(c). When evaluating a motion for summary judgment, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial...against the moving party." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). Nevertheless, "the Court's favor toward the non-moving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). The non-moving party must set forth specific facts showing that there is a material issue for trial and cannot rely upon the mere allegations or denials in the pleadings. Fed. R. Civ. Pro. 56(e); *Celotex*, 477 U.S. at 317. This rule holds for represented and pro se litigants alike. *See Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006). Moreover, the non-moving party must do more than just demonstrate a factual disagreement between the parties; it

must demonstrate that the disputed factual issue is "material." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). The key inquiry is the existence of evidence to support a plaintiff's claims or a defendant's affirmative defenses, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999).

## III.

### DISCUSSION

Mr. Morris argues that IBT discriminated against him based on his race in violation of Title VII of the Civil Rights Act of 1964. [Dkt. 1 at 1.] He seeks monetary payment, lost wages, and lost benefits. [*Id.* at 2.]

**A) Proving a Claim of Race Discrimination**

The statute that Mr. Morris cites in his Complaint forbids discrimination based upon race. 42 U.S.C. § 2000e5. Mr. Morris can attempt to prove that he was fired or mistreated based on his race in two ways: directly or indirectly. To qualify as direct evidence of discrimination, Mr. Morris must show that discriminatory conduct was related directly to the employment decision in question. *Hemsworth v. Quotesmith.com, Inc.,* 476 F.3d 487, 491 (7th Cir. 2007). If Mr. Morris cannot offer direct evidence of discrimination, he can only prevail on his claim if he is able to satisfy the requirements for indirect discrimination under the well-established test articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 482 (1973).

**B) Showing Race Discrimination Directly**

To show direct discrimination, a plaintiff must provide evidence that the discrimination was directly related to the employment decision at issue. *See Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir. 1999) (explaining what "direct" evidence of discrimination means); *Rozsko-*

*wiak v. Vill. of Arlington Heights*, 415 F.3d 608, 612 (7th Cir. Ill. 2005) (statements made by someone not involved in making the decision at issue are not direct evidence of discrimination).

Mr. Morris argues that his termination was actually based on his race [dkt. 1 at 2], because he heard or was told about racist comments during his employment at TIN. First, he overheard a conversation between two TIN managers in which the "N" word was used. [Dkt. 32-3 at 48.] Additionally, Morris claims that Gary Huxhold used the phrase "nigger-rig," was made in his presence prior to his termination. [Dkt. 32-3 at 51.] Finally, Mr. Morris argues that another employee told him that other IBT managers made comments regarding race outside his presence. [*Id*. at 55-57.]

Nevertheless, he admits that the comments "didn't have to do with any employment decision." [*Id*. at 54.] Moreover, Mr. Morris does not attribute the comments to anyone responsible for making the decision to fire him. [Dkt. 32-1 at 54.]

Because Mr. Morris does not attempt to show that the racist remarks were directly related to the decision to terminate him, Mr. Morris cannot directly prove discrimination. *Miller*, 168 F.3d at 312.

### C) **Showing Race Discrimination under *McDonnell Douglas***

The *McDonnell Douglas* test requires Mr. Morris to establish a *prima facie* case of discrimination. To do this, he must show: (1) that he is a member of a protected class; (2) that he was performing his job satisfactorily; (3) that he suffered an adverse employment action; and (4) that similarly situated employees outside of his protected class were treated more favorably. *Goodwin v. Board of Trs. of the Univ. of Ill.*, 442 F.3d 611, 617-18 (7th Cir. 2006). An employee is "similarly situated" if he is "directly comparable to [the plaintiff] in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002).

Because TIN concedes that elements one and three are satisfied, the elements in contention in this case are the second and the fourth.

With respect to the second element, Mr. Morris admits that he was performing below TIN's expectations. [Dkt. 32-3 at 22-26.] Likewise, he admits that his low production review was "not discrimination" or the result of a lie. [*Id. at* 19-20, 25.] Indeed, Mr. Morris concedes that TIN had at least three performance-related reasons to terminate him—cursing at his employee in March 2007, his substandard yearly performance review in February 2008, and his continued low production numbers. Mr. Morris even admits that he "should have been fired" but complains that Mr. Page should have been terminated before he was terminated. [Dkt. 32-1 at 60-61.]

The Seventh Circuit has made clear that a pattern of performance deficiencies rebuts a claim that a plaintiff has met his employer's legitimate expectations. *Contreras v. Suncast Corp.*, 237 F.3d 756, 760-61 (7th Cir. 2001). Because Mr. Morris admits to these deficiencies, cannot establish the second element of his claim. *Id.*

As to the fourth element, Mr. Morris argues that the company treated similarly situated non-African-American supervisors more favorably than him. "To assess whether two employees are similar for purposes of the "similarly-situated" test, "a court must look at all relevant factors, the number of which depends on the context of the case." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir.2000). Here, the two other D Shift supervisors, both of whom are white and both of whom were accountable for the same low production numbers as Mr. Morris, [dkt. 31 at 9], are the proper comparators. *Id.*

Mr. Morris admits his performance was "consistent with that of the other supervisors." [Dkt. 34 at 3.] However, he contends that they were treated more favorably than he because they

received "more write-ups" than he did for poor performance. [Dkt. 34 at 5.] In that vein, he believes that if his performance were low enough to warrant termination, he should have been disciplined before he was fired. [*Id*. at 3.]

TIN argues, however, that since both white supervisors were counseled and ultimately terminated because of the D Shift's low production numbers, Mr. Morris has no grounds for claiming that they were treated more favorably. [Dkt. 39 at 9.] Indeed, TIN argues, "[w]hen pressed on this point in his deposition, [Mr.] Morris's only complaint was that TIN should have terminated him third rather than second." [*Id.*]

Based on the record, the Court cannot find that Mr. Morris' white co-supervisors were treated more favorably than he was. First, Mr. Morris was in fact warned about his low production numbers and his inappropriate conduct toward his coworkers between March 2007 and February 2008. [Dkt. 32-1 at 32-35, 38-39.] Moreover, Mr. Morris' white and similarly situated co-supervisors were similarly fired for their low production numbers after being warned about the same within several months of Mr. Morris' termination. [Dkt. 32-3 at 3.] Although Mr. Morris argues that Mr. Page should have been fired before him, he has presented no evidence to support that claim. Nor has he presented evidence to undermine IBT's suggestion that Mr. Page may have had more warnings because he had worked for IBT for 25 years. [Dkt. 32-1 at 60-61.]

On a motion for summary judgment, Mr. Morris' must present admissible evidence to support each element of the *McDonnell Douglas* test—his inability to show that he was performing his job satisfactorily or that his similarly situated, white co-supervisors were treated more favorably than he was undermines his entire claim. *Celotex*, 477 U.S. at 323 (holding that Rule 56(c) requires summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear

the burden of proof at trial"); *Bosley v. Rush Prudential Health Plans*, No. 99-3669, 2000 WL 622883, at *4 (7th Cir. 2000) (plaintiff unable to establish *prima facie* case of race discrimination where evidence established that "similarly situated [white] employees were treated the same as [the plaintiff]").

Therefore, the Court finds that Mr. Morris cannot support a claim of race discrimination.

### D) Burden Shifting under *McDonnell Douglas*

Under *McDonnell Douglas*, if Mr. Morris could establish a *prima facie* case of unlawful discrimination, then the burden would shift to TIN to articulate a legitimate, non-discriminatory reason for the employment action—here, Morris' discharge. *See Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000). If TIN could do so, the burden would then shift back to Mr. Morris to show that TIN's reason for discharging him was merely a pretext—"a dishonest explanation, a lie [about the real reason for his termination] rather than an oddity or an error." *Kulmani,* 224 F.3d at 685.

#### 1) Has TIN articulated a legitimate, non-discriminatory reason for firing Mr. Morris?

Here, the parties agree that low production numbers are in fact a legitimate reason for termination. [Dkt. 32-1 at 28, 39-40.] The parties further agree that Mr. Morris's low performance could have warranted his termination; that Mr. Morris' performance evaluation was done to "the best of his [supervisor's] knowledge;" and that Mr. Morris' performance evaluation was not the result of lies or discrimination. [Dkt. 32-1 at 25-27.]

Therefore, Court is satisfied that TIN has articulated a legitimate, non-discriminatory reason for terminating Mr. Morris' employment.

### 2) Can Mr. Morris show that the reason for his termination is a pretext for racial discrimination?

To show pretext, Mr. Morris must "present evidence that the proffered reason is "either a lie or completely lacking a factual basis." *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000). The analysis of pretext focuses only on what the decision-maker, and not anyone else, sincerely believed. *Little v. Ill. Dep't. Of Revenue*, 369 F.3d 1007, 1015 (7th Cir. 2004). The Court must therefore evaluate whether Mr. Morris put forth sufficient evidence to rebut the presumption that the TIN managers responsible for firing him "honestly believed in the non-discriminatory reasons [they] offered, even if the reasons are foolish or trivial or even baseless." *Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 890 (7th Cir. 1997).

Mr. Morris has presented evidence to show that racist comments were made by employees and managers at IBT. [*Id.* at 46-54.] However, he admits that he does "not know who was involved in [his] termination." [Dkt. 32-1 at 54.] He has not attempted to connect the comments to his employment decision.

The Seventh Circuit has clearly held that pretext is not demonstrated by isolated statements unrelated to the employment decision at issue. *Ritter v. Hill 'n Dale Farm, Inc.*, 231 F.3d 1039, 1044 (7th Cir. 2000). Therefore, assuming the racist comments that Mr. Morris describes are admissible, the Court cannot find that they show that TIN was lying about its reasons for firing him. Mr. Morris' inability to connect the comments to his performance, to TIN's evaluation of his performance, or to the individuals responsible for the decision to terminate Morris's employment, undermines his claim that racism was the real reason for his termination. *Logan v. Kautex Textron N. Am.*, 259 F.3d 635, 639 (7th Cir. 2001) (upholding summary judgment where individual who made racially charged comments was not the final decision-maker).

Aside from the isolated and remote racist comments, Mr. Morris has presented no evidence to show that the reason for his termination—his low production numbers—was mere pretext for discrimination. The Court thus finds no reason to doubt TIN's legitimate, non-discriminatory reason for firing Morris. *Celotex*, 477 U.S. at 323.

In sum, even if Mr. Morris could establish a prima facie case of discrimination—which he cannot here—he could not then show that TIN's legitimate, non-discriminatory reason for his termination was a pretext for racial discrimination.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** TIN's motion for summary judgment. [Dkt. 30.] Mr. Morris shall take nothing by way of his complaint. Judgment will enter accordingly.

12/16/2010

*signature*

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via US Mail:**

TERRANCE MORRIS
714 Johnson Drive
West Memphis, AK 72301


**Distribution via ECF only:**

Christopher J. DeGroff
SEYFARTH SHAW
cdegroff@seyfarth.com

Ada W. Dolph
SEYFARTH SHAW LLP
adolph@seyfarth.com

Kyle R. Hartman
SEYFARTH SHAW LLP

khartman@seyfarth.com